**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LIDDALE JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 07 C 5897** |
| | ) | |
| **v.** | ) | |
| | ) | **Hon. Michael T. Mason** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge.

Claimant Liddale Jones ("Jones" or "claimant") has brought a motion for summary judgment [23] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Jones' claim for Disability Insurance Benefits under the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i) and 423(d), as well as Jones' claim for Supplemental Security Income (Title XVI) under the SSA, 42 U.S.C. § 1382. The Commissioner filed a cross-motion for summary judgment [27] asking that we uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear the matter pursuant to 42 U.S.C. § 405(g). For the reasons below, Jones' motion for summary judgment is granted in part and denied in part, and the Commissioner's motion for summary judgment is denied. This case is remanded to the SSA for further proceedings consistent with this opinion.

**I.      BACKGROUND**

## A.     Procedural History

Claimant filed applications for Disability Insurance Benefits and Supplemental Security Income on August 15, 2003, alleging a disability onset date of August 15, 2003.[1] (R. at 84-86).  His applications were denied initially on March 15, 2004, and again on October 28, 2004, after a timely request for reconsideration.  (R. at 20, 30-39).  Claimant then filed a timely request for a hearing.  (R. at 20, 40).  ALJ Percival Harmon ("ALJ Harmon") held a hearing on February 1, 2006, with a supplemental hearing on November 22, 2006.  (R. at 342-420).  Jones, Dr. Hugh R. Savage, a medical examiner, and Julie L. Bose, a vocational expert, testified at the November 22, 2006 hearing.  (R. at 20, 364-420).  On March 30, 2007, ALJ Harmon issued a written decision denying claimant's request for benefits.  (R. at 17-27).  The ALJ found that based on claimant's "age, education, work experience, and residual functional capacity" ("RFC"), a significant number of jobs existed in the national economy that Jones could perform.  (R. at 25).  The Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner.  (R. at 7-9); 20 C.F.R. § 404.981.  Claimant subsequently filed this action.

## B.     Medical Evidence

---

[1] There is a discrepancy in the record regarding the date of filing and the alleged disability onset date.  The ALJ noted that claimant filed his Disability Insurance Benefits application on August 20, 2003, and the Supplemental Security Income application on August 15, 2003, with an onset date of disability in both applications of August 15, 2003.  (R. at 20).  However, Jones' application for benefits reflects August 15, 2003 filing and onset dates.  (R. at 84-86).  Additionally, at the hearings before the ALJ, Jones complained of a disability going back as far as December 2000.  (R. at 352).  These discrepancies may be due in part to the claimant's previous filings for benefits.  (R. at 364).  In any event, at oral argument before this Court, counsel for Jones stated the applicable onset date is 2003 (3/4/09 Tr. at 6-7 [36]), and the precise day and month is not dispositive of any issue here.

Jones' benefits applications states that he is obese and suffers from uncontrolled diabetes mellitus, arthritis primarily in his knees, hypertension, and blindness in his right eye. (R. at 84-86; *see also* R. at 81). Jones also alleged that his condition causes him pain and occasional blurred vision in his left eye. (*Id.*). In support of his disability claim, Jones submitted medical records from various emergency room and treating physicians, including those of Cook County Hospital (now known as Provident Hospital of Chicago) ("Cook County Hospital" or "Provident"), John H. Stroger, Jr. Hospital of Cook County ("Stroger Hospital"), Fantus Health Center at Stroger Hospital ("Fantus Health Center"), the Englewood Clinic, Mount Sinai Hospital, and Infant Jesus Medical Center. (R. at 164-338.)

In September 1996, Jones suffered injuries from a gun shot wound in his lower right back resulting in a fracture of the right posterior ribs, right hemothorax, minute right-sided pneumothorax, a small liver contusion, and a bullet fragment projecting anterior to his T11 vertebral body. (R. at 273-310, 367-68). He received treatment at Mount Sinai Hospital for these injuries. (R. at 273-310). At that time, Jones informed the medical treater that he is diabetic. (R. 294).

The record does not contain any medical records between October 1996 and May 25, 2000. On May 26, 2000, Jones sought treatment at Cook County Hospital Emergency Room, complaining of dizziness and polyurea. (R. at 198-99). Jones remained at the hospital until June 1, 2000. (R. at 198-210). Upon discharge, he was instructed to "take medication as ordered, keep follow-up appointment." (R. at 209).

In 2001, Jones sought treatment at the Cook County Hospital Emergency Room on two separate occasions for issues related to his diabetes. (R. at 180-85). On July 16,

2001, claimant went to the Emergency Room reporting symptoms of dizziness. (R. at 184). Jones reported he had run out of his medication approximately one week earlier and had begun to feel fatigued and dizzy, but was unable to obtain a refill for his insulin. (*Id.*). Jones was given a prescription for medication and released. (*Id.*). On October 1, 2001, Jones went to the Emergency Room reporting symptoms of "fever, fatigue, nausea, dizziness," increased "urination," and "headache." (R. at 180, 183). Jones was out of insulin and given a prescription for a refill. (R. at 181, 183).

On January 15, 2002, Jones returned to the Cook County Hospital Emergency Room due to swelling and redness of his right ankle and bruising on his right lower leg. (R. at 249-51). Claimant reported that his injuries were caused by wrestling with his nephews. (*Id.*). An x-ray of his right ankle did not reveal any acute fracture or dislocation. (*Id.*). On February 11, 2002, Jones returned to Cook County Hospital and sought treatment for right shoulder pain caused by a fall. (R. at 248). Claimant reported that, as a result of the fall, he had "blood in [his] urine," his "right arm goes numb frequently," and "hematuria." (*Id.*). Two months later, on April 18, 2002, Jones fell again, causing a fractured fifth metatarsal shaft of his left foot with soft tissue swelling. (R. at 247, 271). Jones received follow-up treatment for the fracture at Fantus Health Center on May 2, May 3, and May 17, 2002. (R. at 246-47, 270-71). The medical record do not reflect the cause of the fall. (R. at 246-48, 270-71).

The record does not contain any medical records from May 18, 2002 through February 18, 2004. The next medical record, dated, February 19, 2004, reflects a consultative internal medicine examination for submission to the Illinois Bureau of Disability performed by Dr. Peter Biale ("Dr. Biale"). (R. at 151-155). Jones' reported complaints

4

included diabetes, pain in his knees, and low back pain. (R. at 151). Dr. Biale noted that Jones had a prosthetic right eye and 20/100 "far vision with correction" in his left eye. (R. at 152). Dr. Biale noted that Jones "has been diabetic since the year 2000" and reported "four diabetic ketoacidosis admissions." (R. 151). Jones informed Dr. Biale that he feels tired with a lack of energy "most of the time." (R. at 154). Dr. Biale concluded that Jones was obese and had "full range of motion" in his knees and lower back. (*Id.*).

On March 5, 2004, Dr. George R. Andrews ("Dr. Andrews"), the Illinois Disability Determination Services' medical consultant, conducted a RFC assessment of claimant. (R. at 156-63). Dr. Andrews indicated that claimant's file did not include a treating or examining physician's statement regarding his physical capacities. (R. at 162). However, Dr. Andrews took note of Dr. Biale's consultative exam performed on February 19, 2004. (R. at 163).

At the time of the assessment, claimant weighed 224 pounds. (R. at 163). He alleged a disability based on his diabetes mellitus, arthritis, and vision problems, and stated his "pain and fatigue" limited his activities of daily living. (*Id.*). Dr. Andrews diagnosed claimant with diabetes mellitus, "obesity," and "decreased vision," along with "other alleged impairments" of low back and knee pain. (R. at 156). Dr. Andrews concluded that Jones could lift and/or carry 50 pounds occasionally and frequently lift and/or carry 25 pounds. (R. at 157). He found that Jones could stand, walk, and sit for approximately six hours in an 8-hour work day; had unlimited ability to push and/or pull (other than as limited by his ability to lift and/or carry); and had "difficulty squatting due to [his] obesity." (R. at 157-58, 163). Dr. Andrews concluded Jones' visual capacity was limited in far acuity, but that no retinopathy or nephropathy was present. (R. at 159, 163). Dr. Andrews determined that claimant had no manipulative, communicative, postural or environmental limitations. (R.

at 158-60). While claimant reported diabetic ketoacidosis admissions, Dr. Andrews found this not to be credible, "as the hospital indicates no rec[or]ds of admit for over one year." (R. at 163.)

On April 13, 2004, Jones sought treatment at Fantus Health Center. (R. at 168-69, 233-34). Jones' weight had gone down to 200 pounds, and he presented with diagnoses of a "blind right eye," "diabetes," and "arthritis." (R. at 168, 233). At this visit, Jones also complained of "fatigue, low energy, dizziness," "nausea," and "diarrhea." (R.168-69, 233-34). On May 26, 2004, Jones, weighing 213.5 pounds, returned to Fantus Health Center for a follow-up on his diabetes condition. (R. at 166, 235). Approximately one month later, on July 9, 2004, Jones had another follow-up appointment. (R. at 170-71, 236). Jones weighed 227 pounds. (R. at 170, 236). The related records note that claimant did not present with "hypoglycema or hyperglycemic" episodes, but that it needed to be determined if he required more insulin. (*Id.*). On August 11, 2004, Jones sought follow-up treatment at Stroger Hospital. (R. at 165, 227). Jones weighed 232 pounds and the treatment notes state "hypoglycemia." (*Id.*).

Jones sought medical treatment several times in 2005. (R. at 217-56). On January 21, 2005, Jones had a routine check-up at Fantus Health Center. (R. at 225). He weighed 247 pounds, and the records note that his medications were refilled and his blood sugar was uncontrolled. (*Id.*). Follow-up labs taken on January 25, 2005 revealed an abnormal hemoglobin level of 10.5. (R. at 224). On January 26, 2005, Jones had x-rays taken at Provident Hospital of his knees and left shoulder due to his complaints of pain. (R. at 172-74, 348). According to the reviewing radiologist, the x-rays showed minimal degenerative

change in both knees and a normal reading for the left shoulder.[2] (*Id.*). On May 27, 2005, Jones had a follow-up appointment at Fantus Health Center related to his diabetes and "hypoglycema" diagnoses. (R. at 221). Jones reported he had been homeless and lived in a shelter, but currently resided with his sister. (*Id.*). At this appointment, Jones weighed 211.5 pounds, and the treating physician noted that he "was not taking medications properly." (*Id.*). On June 10, 2005, Jones had another appointment at Fantus Health Center. (R. at 217). He weighed 212 pounds, reported he was "homeless and not eating well," and complained of dizziness and weight loss. (*Id.*). The treater noted that Jones' blood sugar was "uncontrolled." (*Id.*).

On June 21, 2005, Jones went to the Emergency Room at Provident Hospital complaining of blurred vision for the previous two weeks. (R. at 258-68). The treating physician diagnosed Jones with "hyperglycemia" and "poorly controlled diabetes." (R. at 258, 263). On August 16, 2005 and October 20, 2005, Jones had follow-up appointments at Fantus Health Center and received refills on his medications. (R. at 216). He returned on October 22, 2005, and reported back pain from his bullet wound. (R. at 255-56).

On October 25, 2005, Jones had an appointment with Dr. Emmanuel Nwumeh ("Dr. Nwumeh"). (R. at 214). Jones, weighing 245.5 pounds, again reported back pain due to his bullet wound. (R. at 214). Dr. Nwumeh discussed claimant's obesity and recommend follow-up appointments in two to three months. (*Id.*). Jones returned for follow-up on January 18, 2006. (R. at 212-13). Claimant weighed 227 pounds and complained of

---

[2] Jones testified at the February 1, 2006 hearing that his back was also x-rayed on this date. (R. at 349.) However, there are no results of any back x-ray in the record or any other indication such an x-ray was ever taken.

dimness of vision. (*Id.*). Dr. Nwumeh noted that Jones had uncontrolled diabetes, had not taken his insulin that day, and was "asked to take it now." (R. at 212).

Dr. Nwumeh completed an RFC assessment of Jones on January 30, 2006. (R. at 175-78). Dr. Nwumeh indicated that he sees claimant every three to four months, that Jones has a diagnosis of "diabetes mellitus," and that his prognosis is "guarded." (R. at 175). Dr. Nwumeh noted Jones' obesity, with his current weight at 227 pounds, and his opinion that Jones had "severe hypoglycemia." (*Id.*). On the portion of the RFC requesting "all of your patient's symptoms," Dr. Nwumeh identified fatigue, excessive thirst, retinopathy, and hyper/hypoglycemic attacks. (*Id.*). However, Dr. Nwumeh did not indicate that Jones' experienced other symptoms listed on the form, such as episodic vision blurriness, frequency of urination, or dizziness/loss of balance. (*Id.*). Dr. Nwumeh found that Jones can only sit continuously for 2 hours and 15 minutes before needing to get up; stand for 1 hour and 5 minutes at a time; needs to walk for 10 minute intervals during an 8-hour workday; requires a job with shifting physical positions; "with prolonged sitting" would need to elevate his leg(s) 30 centimeters during the work day; needs use of a cane; can occasionally lift and carry less than 10 pounds; can rarely twist, stoop, crouch or squat, or climb ladders and stairs; and also has a limited ability in hand manipulations for 70 percent of an 8-hour workday. (R. at 176-177). Based on this evaluation, Dr. Nwumeh opined that Jones could not tolerate "even 'low stress' jobs." (R. at 176).

On April 7, 2006, Jones saw Dr. Nwumeh at the Englewood Clinic for a scheduled appointment. (R. at 316). Jones weighed 235.5 pounds and Dr. Nwumeh determined that claimant's diabetes was uncontrolled due to diet and indiscretions. (*Id.*). The doctor advised Jones to avoid pure sugar and use sugar substitutes, and refilled his prescription.

8

(*Id.*).  On July 3, 2006, Jones missed a scheduled appointment with Dr. Nwumeh.  (R. at 317).

On September 19, 2006, Dr. Nwumeh filled out an additional Obesity RFC for Jones. (R. at 311-315).  Dr. Nwumeh indicated Jones weighed 235.5 pounds, experiences dimness of vision, back pain, and polyurea, and has uncontrolled diabetes and obesity with "possible hypoglycemia from insulin."  (R. at 311).  Dr. Nwumeh diagnosed Jones with diabetes with a prognosis of "good."  (*Id.*).  Unlike the earlier RFC form Dr. Nwumeh completed, this form did not provide a list of patient symptoms for the doctor to check where applicable.  (R. at 311-15).  Dr. Nwumeh opined that Jones would frequently experience "pain or other symptoms severe enough to interfere with [his] attention and concentration needed to perform even simple work tasks."  (R. at 312).  Consistent with his previous assessment, Dr. Nwumeh found that Jones would be incapable of even low stress jobs.  (*Id.*).  Dr. Nwumeh further opined that Jones was limited to walking two city blocks without rest or severe pain; could sit and stand for 10 minutes at a time; stand/walk for less than two hours in an 8-hour workday; would need to stand up and walk for 10 minutes every 15 minutes; would frequently need 30 minute breaks in an 8-hour work day; "with prolonged sitting," would need to elevate his leg(s) one foot from the ground for 60 percent of an 8-hour workday; would need use of a cane; can occasionally lift less than 10 pounds and rarely twist, stoop (bend), crouch, or climb ladders or stairs; and his impairments or treatment would cause him to be absent from work "more than 4 days per month." (R. at 312-15).

Notably, Dr. Nwumeh marked "No" to Jones having significant limitations in repetitive reaching, handling, and fingering.  However, he also indicated that Jones could use his

9

hands, fingers, and arms for repetitive activities (such as grasping, turning and twisting objects, finger manipulations, and reaching) only 30 percent of the day. (R. at 314). In an attachment to this obesity RFC assessment, Dr. Nwumeh amended this conclusion and confirmed that Jones could use his hands, fingers, and arms for "repetitive reaching, handling, or fingering" only 30 percent of the day. (R. at 319, 321). He also indicated that Jones was compliant with his medication, and reiterated that claimant was incapable of even low stress jobs. (*Id.*).

In 2007, Jones had follow-up appointments for his diabetes at Infant Jesus Medical Center on April 7, April 14, and June 7. (R. at 328-31). The treatment notes for those visits indicate Jones' diagnoses of diabetes and hypertension and that his blood sugar was monitored. (*Id.*). At the June 7, 2007 appointment, Jones weighed 234 pounds with a diagnosis of hypertension, pain in his knees, and diabetes. (R. at 328.)[3]

## C. Claimant's Testimony

Jones provided limited testimony at the initial hearing on February 1, 2006. (R. at 342-61). Claimant testified his alleged disability began in December 2000. (R. at 352). In 2000, he was hospitalized for one week and visited the Stroger Hospital Emergency Room twice for diabetes and his blood sugar "being out of control." (R. at 345-47). Jones testified that since 2004, he had received treatment at the Englewood Clinic, and that his current physician at that clinic was Dr. Nwumeh. (R. at 344). Claimant stated that on January 26, 2006, he had x-rays taken at Provident Hospital of his knees and left shoulder due to pain he was experiencing. (R. at 347-48). Jones reported that he was currently

_____

[3] This is all of the information this Court could glean from these otherwise illegible 2007 treatment notes.

living in a shelter for an unspecified period of time, which he claimed caused him to anticipate "not see[ing] a doctor next in less than six months to a year." (R. at 358-59). During the February 1, 2006 hearing, the ALJ asked Jones' counsel to obtain additional medical records, including the treating records of Dr. Nwumeh, Jones' then-current physician. (R. at 348-50). The ALJ stated he would keep the record open until March 17, 2006 in order to receive those documents. (R. at 360).

After claimant submitted additional materials, the ALJ held a supplemental hearing on November 22, 2006, and asked more detailed questions of Jones. (R. at 362-420).[4] Claimant testified that he was born on March 6, 1957, was 49 years old, single, and had an eleventh grade education. (R. at 370-71). At the time of this hearing, Jones stood 5' 6'' tall and weighed approximately 245 pounds. (R. at 375). Jones testified that his weight fluctuated between 200 and 285 pounds, with his normal weight around 200. (R. at 375). Jones had been living with his sister for approximately two months, but and previously lived at the Olive Branch Homeless Shelter. (R. at 371).

Claimant performs some housework, and he frequently rests at home and does not exercise. (R. at 372-74, 376). He cooks simple meals, rarely washes the dishes, and occasionally sweeps the floor. (R. at 372-73). Jones does not dust, vacuum, mop the floor, or do laundry, but occasionally makes his own bed. (*Id.*). Jones showers, bathes, and dresses himself. (R. at 391-92). He reported being able to lift and carry approximately ten pounds or the equivalent of a grocery bag. (R. at 391).

---

[4] As claimant's counsel conceded at oral arguments, Jones' prior counsel submitted only some of Dr. Nwumeh's treatment notes in response to the ALJ's request for additional medical records. (3/4/09 Tr. at 9, 19, 22.) It is not clear why all of Dr. Nwumeh's treatment notes were not submitted.

Jones stated that he lost his right eye approximately ten years earlier and wears glasses. (R. at 379). When asked about his reading ability, claimant testified he tries to read the Bible. (R. at 373-74). Claimant's poor eyesight affects his ability to drive, and he has not driven since 1999 or 2000. (R. at 372, 380). Jones uses public transportation and is able to get around by himself. (R. at 380.)

Jones suffers from pain in his knees, primarily his left, due to arthritis. (R. at 382). He claims that he is often tired and has difficulty sleeping at night because of his legs going "dead" and the pain in his knees. (R. at 378). He stated that since approximately 2003 or 2004, his doctor told him to keep his legs elevated on a crate to help with the pain. (R. at 389-90). Jones testified that, approximately two months before the November 22, 2006 hearing, his knee gave out and he fell down some stairs. (R. at 392). Although he reported needing a cane to walk long distances, he did not have a cane with him at the hearing. (R. at 392-93).

Jones also complained of lower back pain. (R. at 384-85). Jones testified that he has the ability to walk one or two blocks before needing to sit down. (R. at 385). He testified he also broke his left foot (he did not specify when) and now needs to wrap it in "cold and rainy" weather conditions. (R. at 385-86.)

Regarding medication, Jones testified that he takes "30 units of insulin" and Metformin "twice a day" for his diabetes. (R. at 380-81). He admitted that he takes his medication irregularly and had recently gone without it for a two month period. (R. at 381). Jones also testified that he was hospitalized in 2005 for diabetes because he ran out of his medication. (R. at 381-82). When asked about running out of his medication or not having it for several days, Jones stated that "they don't give you an appointment like every six

12

months," and he would need to pick up his medication if someone could not pick it up for him. (R. at 381). Claimant has been prescribed 800 milligrams of ibuprofen and "arthritis pills" for his pain. (R. at 382-83). When asked how often he takes ibuprofen, Jones responded that he takes it when the pain is "real bad," about two or three times a week. (R. at 383). Jones reported that the ibuprofen makes him "sleepy." (*Id.*). When asked about other side effects of his medications, Jones stated that he is "sleepy and get dizzy most of the time" and uses the "washroom a lot." (R. at 393). Jones has also been prescribed a special diet, but he cannot "afford what they say [he] should eat." (*Id.*).

Claimant testified that at his most recent visit to his doctor his blood pressure was still high. (R. at 382). Jones reported having occasional blurred vision, which his doctor attributed to his blood sugar level fluctuation. (R. at 386-87). He testified that this blurred vision "comes and goes" and does not last all day. (R. at 387). During his episodes of blurred vision, Jones is still able to see larger objects, such as "a chair or something in front of [him]." (*Id.*). Claimant reported a history of dizziness for approximately the past year, occurring when he bends over or stands up. (R. at 376-77).

Regarding his employment history, Jones testified that from 2000 to 2001, he worked as a mail sorter for the United States Postal Service. (R. at 394). He did not do any lifting, but sorted mail by hand. (*Id.*). Claimant was fired from this position due to the Postal Service's belated discovery that he had a felony manslaughter conviction. (R. at 398). Before this job, but during an unspecified time period, Jones testified he worked at "Carry Ingredients" as a forklift driver "picking orders." (R. at 396). According to claimant, this job required him to lift 25 to 30 pounds occasionally. (R. at 397-98). Jones also worked at the United Center Sports Arena, where his duties included "put[ting] down the

court." (R. at 395-96). Jones was laid off from this position. (R. at 396). According to Jones' earnings statement, he was also employed at Staffing Resources in 2004 for an unspecified period of time and earned approximately $2,850. (R. at 88, 94).

### D. The Vocational Expert's Testimony

Vocational expert Julie L. Bose (the "VE" or "VE Bose") testified at the November 22, 2006 supplemental hearing before the ALJ. (R. at 412-18). The VE described claimant's past work as a mail sorter for the United States Post Office as light and unskilled. (R. at 413). According to the VE, Jones' past work as a fork lift driver was medium and "on the low end of semi-skilled, affording no real advantage over an unskilled worker." (Id.). The VE also stated that Jones' past work at the Sports Arena between 1994 and 1998 was a "laborer's position" and would be heavy and unskilled work. (Id.).

The ALJ asked the VE to consider what work, if any, a hypothetical individual with the claimant's age, education, and work experience could perform if the individual is limited to unskilled work, routine in nature; lifting occasionally and carrying as much as 20 pounds; frequently lifting and carrying 10 pounds; could sit for at least 6 hours in an 8-hour day with customary breaks; could stand and walk for 6 hours in an 8-hour day; could occasionally stoop, squat, crouch, and climb short stairs or ramps; "could not work on ladders, ropes, or scaffolding, or at unprotected heights around hazardous moving machinery"; and is precluded from jobs that require kneeling and crawling. (R. at 413-14). The VE testified that such an individual would be unable to perform any of the claimant's past relevant work. (R. at 414). However, according to the VE, the hypothetical individual could be a mail clerk (6,600 to 7,000 positions in the "Chicago metropolitan area and the six collar counties"), an automatic machine operator (which includes "drill press operator, punch press operator,

14

and blade operator") (8,000 to 8,400 positions), or a laundry worker/folder (1,200 to 1,400 positions). (R. at 414-15).

The ALJ next asked the VE to consider whether the same hypothetical individual could work if he is "limited to blind in the right eye, so having only binocular vision in the left eye." (R. at 415). Although the ALJ apparently misspoke by using the word "binocular" instead of "uniocular" at the time he posed this hypothetical, he accurately stated that claimant is blind in his right eye and could only see out of his left eye. (*Id.*). The VE stated this additional limitation would not rule out any of the above listed jobs. (*Id.*).

The ALJ further limited the hypothetical individual's capacities to someone who "could only stand and walk a total of four hours in an eight-hour day with the binocular vision." (*Id.*). The VE testified that this would put the person in a sedentary or light work category, with a sit/stand option, which would reduce the numbers of the previously suggested jobs available in the Chicago metropolitan area and six collar counties. (*Id.*). Specifically, the VE testified there would be a 50 percent reduction in the number of machine operator positions, but little impact on the mail clerk and laundry worker/folder positions because those are typically done with a sit/stand option. (*Id.*).

Lastly, the ALJ limited the hypothetical individual's capacities to someone who is incapable of sustaining the stress of a low stress job; able to stand and walk for less than 2 hours in 8-hour work day; capable of sitting and standing for 10 minutes at a time at most and would need to change positions every 10 minutes; after working for 20 minutes would need to rest for 30 minutes; needs to elevate one foot "when sitting for as much as 60 percent of the workday"; needs assistance of a cane when standing or walking; be limited to lifting less than 10 pounds occasionally; capable of engaging in twisting, stooping,

crouching, or climbing ladders or stairs less than one third of the day; capable of using his or her hands "only 30 percent of the time for grasping and turning large objects"; capable of using his or her fingers for picking and fingering for 30 percent of the time; capable of reaching in all directions, including overhead, only 30 percent of the workday; and likely to be absent at least 4 days and possibly more per month. (R. at 416-17). The VE testified that under this hypothetical, all work would be precluded. (R. at 417.)

### E. The Medical Examiner's Testimony

Dr. Hugh R. Savage (the "ME" or "ME Savage"), a specialist in Internal Medicine with a secondary "Cardiovascular" specialty, testified as the medical examiner at the November 22, 2006 supplemental hearing. (R. at 63, 399-412). The ME had reviewed the medical evidence submitted by Jones and found that the record established Jones' medically determinable impairments included diabetes mellitus, arthritis of the knee and back, uniocular blindness, and hypertension controlled with medication. (R. at 399). ME Savage reported that he did not receive knee or back x-rays of Jones or a complete list of Jones' medications prior to the hearing. (R. at 400). Claimant and his counsel informed ME Savage that Jones takes one tab of Metformin twice a day for diabetes, 30 units of insulin in the morning and 15 units in the evening, ibuprofen, and 20 milligrams of Enalapril once a day. (R. at 400-01). They also directed ME Savage to the knee x-rays in the record, which according to the radiology reports indicated minimal degenerative disease. (R. at 402-03).

The ME noted that the first mention of arthritis in Jones' medical records was in the

August 3, 2005 progress notes from Fantus Medical Center.  (R. at 403).[5]  In the October 25, 2005 notes of Dr. Nwumeh, there is some reference to back pain, for which claimant was prescribed acetaminophen (Tylenol) and Motrin. (R. at 403-04).  The ME opined that Jones' blood pressure and hypertension are generally controlled.  (R. at 404).  He opined that Jones' failure to take his medication on May 27, 2005, which the ME attributed to Jones' statement that he was homeless at the time, "would throw the blood pressure off." (*Id.*).  The ME further explained that "elevated" and "uncontrolled" blood pressure are "not necessarily the same." (R. at 404-05).  Although the ME had not read Social Security Ruling ("SSR") 02-1p dealing with the evaluation of a claimant's obesity, he testified that he was "familiar with the impact that obesity has generally" on certain conditions and has "experience with treating patients with obesity in terms of presence of other conditions such as diabetes or arthritis."  (R. at 406-07).

The ME found that Jones is "definitely obese," but not morbidly so.  (R. at 408).  He opined that Jones' obesity "is not manifested in the blood pressure, difficulty in blood pressure control," thus indicating Jones' control of his blood pressure is not due to his obesity.  (R. at 408-09).  ME Savage found that Jones' arthritis is not a significant factor because it was rarely mentioned in the progress notes and was not treated aggressively with pain medication, and that Jones is able to see adequately in his left eye despite the blindness in his right.  (*Id.*).  The ME concluded that Jones' condition does not equal a medical listing for a disability.  (R. at 409).

---

[5]  Based on this Court's review, these progress notes do not appear to be those of claimant but of an unrelated female patient.  (R. at 215).  As noted above, the first medical records before this Court to mention "arthritis" are the Fantus Health Center treating notes dated April 13, 2004. (R. at 168.)

The ME observed that the two RFCs Dr. Nwumeh completed and the RFC Dr. Andrews completed varied significantly. (R. at 409-10). The ME disagreed with Dr. Nwumeh's conclusion that one or both of Jones' feet needed to be elevated because he "d[i]dn't see that referenced anywhere in the notes that there was significant difficulty that would require that." (R. at 410). ME Savage did not believe the record supported Dr. Nwumeh's findings regarding Jones' difficulties with hand manipulation. (R. at 411). He disagreed with the lifting limitations set forth in Dr. Nwumeh's RFCs. (*Id.*). The ME opined that Jones could lift 20 pounds occasionally and 10 pounds often. (R. at 411-12). He also stated that "medium [work] or [lifting] 50 and 25 [pounds] would be excessive." (R. at 412). Based on his review of the record, the ME testified Jones could do six hours a day of work standing and a "light type of exertion." (R. at 412.)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This Court must consider the entire administrative record, but will not re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks

evidentiary support or an adequate discussion of the issues." *Lopez,* 336 F.3d at 539 (*quoting Steele,* 290 F.3d at 940)*.*

Additionally, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.      Analysis under the Social Security Act

To be entitled to either Disability Insurance Benefits or Supplemental Security Income payments, a claimant must establish that he is "disabled" under the SSA. A person is disabled under the SSA if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

In making the determination of whether a claimant is disabled, an ALJ must apply the following five-step inquiry: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment(s) meets or equals one that the Commissioner considers conclusively disabling (a listing level impairment); (4) if the claimant does not have a conclusively disabling impairment, whether the claimant can perform his past relevant work; and (5) whether the claimant is capable of performing work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant bears the burden of establishing a disability at steps one through

four. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). At step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.*

ALJ Harmon employed this five-step analysis in his decision. At step one, the ALJ found that Jones has not engaged in substantial gainful activity since the alleged onset date of August 15, 2003. (R. at 22). At step two, the ALJ found Jones' "obesity, diabetes mellitus, right eye blindness, status-post gunshot wound, status-post fracture of the left fifth metatarsal, [and] mild arthritis of the knees" were severe impairments. (*Id.*). At step three, ALJ Harmon found that those severe impairments did not meet or medically equal one of the listed impairments that the Commissioner considers conclusively disabling. (R. at 23). Next, the ALJ determined claimant's RFC was limited to performing unskilled activities. (*Id.*). The ALJ found that Jones had the RFC to: lift and carry 20 pounds occasionally; walk/stand four hours in an 8-hour day; sit six hours in an 8-hour day with a sit/stand option; occasionally climb ramps, stairs, stoop, squat, and crouch, and perform no kneeling or crawling. (*Id.*). At step four, the ALJ determined Jones could no longer perform any of his past relevant work. (R. at 25). At step five, ALJ Harmon found that Jones was able to perform a significant number of jobs in the national economy. (*Id.*). Thus, the ALJ concluded that Jones was not disabled as defined by the SSA. (R. at 26.)

In his motion for summary judgment, Jones argues that the ALJ erred because he: (1) failed to properly weigh the opinions of Jones' treating physician Dr. Nwumeh; (2) failed to properly analyze Jones' credibility by incorrectly finding his complaints of dizziness and fatigue not credible, and by not following the factors listed in SSR 96-7p when considering

Jones' failure to take his medication[6]; and (3) incompletely assessed Jones' RFC by not considering Jones' allegations of fatigue, frequent urination, excessive thirst, and dizzy spells. At oral argument, counsel for Jones raised an additional issue: (4) that the ALJ incorrectly characterized Jones' vision as "binocular" when posing hypothetical questions to the VE. We consider each of these arguments in turn.

### III. THE ALJ FAILED TO PROPERLY EVALUATE THE MEDICAL OPINIONS AND EXPLAIN THE WEIGHT GIVEN TO THE TREATING SOURCE OPINIONS

Jones argues that the ALJ failed to assign proper weight to the opinions of Jones' treating physician and improperly rejected that physician's opinions without adequate reason. Under the applicable regulations, the ALJ must explain the weight given to the opinions of claimant's treating physicians. 20 C.F.R. § 404.1527(d)(2) (stating that "we will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.") Generally, the opinions of a treating physician, who is familiar with the claimant's impairments, treatments, and responses, should be given great weight in disability determinations. *Clifford*, 227 F.3d at 870. If the ALJ does not give controlling weight to the treating physician's opinion, the ALJ must explain the weight given to the treating source's opinion, as well as the weight afforded to the opinions of the State agency medical consultants or other program physicians. 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 404.1527(f)(2)(ii).

Here, ALJ Harmon outlined the medical evidence he considered in making his determination as to Jones' RFC, including reports and opinions from Dr. Biale's consultative

___

[6] SSR 96-7p is a Social Security Ruling dealing with the evaluation of symptoms in disability claims and assessing the credibility of individuals' statements.

examination on February 19, 2004; Dr. Nwumeh's treating source opinions on January 30, 2006 and September 19, 2006; RFC assessments from Dr. Andrews and Dr. Nwumeh; and the opinions of the ME. (R. at 24-25). The ALJ specifically rejected as "unsupported" Dr. Nwumeh's conclusions regarding Jones' needing to elevate his leg 60 percent of the time, occasionally lift and carry less than 10 pounds, and rarely twist, stoop or crawl. (R. at 24). Additionally, ALJ Harmon found that Dr. Nwumeh's conclusions that Jones had no limitation in repetitive reaching, handling, or fingering were inconsistent with Dr. Nwumeh's statements regarding claimant's ability to do those activities only 30 percent of the time in an 8-hour workday. (*Id.*). ALJ Harmon also rejected Dr. Nwumeh's RFC assessments on the ground that they were "excessive in assessing what the claimant can and cannot do." (R. at 25).

The Court agrees with claimant that the ALJ failed to explain the weight accorded to the opinions of Jones' treating physician or the reasons for rejecting that opinion, and further finds that the ALJ failed to evaluate fully the medical opinions in the record. The ALJ failed to state logical grounds for rejecting Dr. Nwumeh's opinions. The ALJ states that Dr. Nwumeh's findings are "unsupported," but gave only one example of an inconsistency related to hand manipulations. (R. at 24). Dr. Nwumeh's first RFC assessment noted that Jones was limited in repetitive reaching, handling, and fingering and that such limitations would result in his being able to use his hands/fingers/arms for only 30 percent of an 8-hour workday. (R. at 177). Further, while Dr. Nwumeh's second, obesity RFC assessment marked "No" to Jones having significant limitations in repetitive reaching, handling, and fingering, in an addendum to that assessment, Dr. Nwumeh corrected his answer to confirm that Jones would be limited 70 to 80 percent of the day in his "ability to perform

repetitive reaching, handling or fingering." (R. at 319, 321). Thus, ALJ Harmon failed to give logical grounds, based on the evidence, for rejecting the opinion of claimant's treating physician, Dr. Nwumeh. Failure to provide good reasons for discrediting a treating physician's opinion is grounds for remand. *Clifford*, 227 F.3d at 870.

Additionally, the ALJ failed to articulate the weight he gave to the opinions of Dr. Nwumeh, whom the ALJ characterized as Jones' treating physician, Dr. Andrews, the Disability Determination Services medical consultant, and ME Savage, who reviewed Jones' medical documentation and gave a RFC assessment at the supplemental hearing. In reaching a decision, the ALJ must evaluate all medical opinions, determine the weight to give each opinion, resolve any conflicts, and articulate his reasons in doing so. *Diaz*, 55 F.3d at 306-07. Here, ALJ Harmon stated that the "informed opinion and rationale of the medical expert, ME Savage, is well-reasoned and articulated and supported by the medical evidence of record." (R. at 25). However, the ALJ provided no further explanation as to why he accepted the ME's opinion over those of Jones' treating physician or Dr. Andrews. Nor did the ALJ provide support for his conclusion that both Dr. Andrews and Dr. Nwumeh "are excessive in assessing what the claimant can and cannot do." (*Id.*). That failure is particularly egregious because Jones himself claimed many of the same limitations the ALJ set forth in his RFC determination. (R. at 25, 372-74, 376, 391-92). Because the ALJ did not articulate or justify the weight given (or not given) to the various medical opinions presented to him, including that of Jones' treating physician Dr. Nwumeh, remand is appropriate. *See, e.g.,* 20 C.F.R. §404.1527(f)(2)(ii); *Clifford*, 227 F.3d at 870 (finding that the ALJ erred when he did not provide an explanation for his belief that the claimant's description of her daily activities were inconsistent with the claimant's treating physician's

23

opinion regarding her limitations to perform work); *see also Lucio v. Barnhart*, No. 03 C

7078, 2004 WL 1433637, **12-13 (N.D. Ill. June 22, 2004) (finding that the ALJ erred

because he failed to articulate the weight given to the treating physician's opinion nor did

he explain the weight given to the opinions of the consultative examiner or the State agency

physicians).   On remand, the ALJ must clarify the weight given to each of the medical

opinions in the record and specifically articulate his reasons for accepting or rejecting those

opinions.

## IV.   THE ALJ FAILED TO CONSIDER THE EVIDENCE IN ITS ENTIRETY WHEN MAKING HIS CREDIBILITY DETERMINATION

Jones also contends that the ALJ erred in his credibility determination by failing to

follow the requirements of SSR 96-7p and by incorrectly concluding that Jones' complaints

of dizziness and fatigue were not credible.  In assessing credibility, SSR 96-7p requires an

ALJ to consider a claimant's daily activities; the location, duration, frequency, and intensity

of his symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and

side effects of any medication; his course of treatment; any treatment other than medication

that he uses or has used to relieve his symptoms; and any other factors concerning his

functional limitations and restrictions due to his pain or other symptoms.  The rule also

requires the ALJ to base his or her credibility assessment on all the evidence in the record,

and to articulate the reasons behind his or her credibility evaluation.

To succeed on his claim that ALJ Harmon made an incorrect credibility

determination, Jones must overcome the highly deferential standard that we accord

credibility determinations.  *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding

that the credibility determinations of hearing officers are afforded special deference).

Because the ALJ is in a superior position to assess the credibility of a witness, we will reverse an ALJ's credibility determination only if claimant can show that it was "patently wrong." *Id.*

The Court finds that, when determining the extent to which Jones' symptoms limit his ability to do basic work activities, the ALJ failed to evaluate the intensity, persistence, and limiting effects of those symptoms. Among other things, ALJ Harmon failed to address Jones' reported limitations on his daily activities, including his alleged inability to do laundry, his cooking of only simple meals, and his rare assistance with other chores. (R. at 372-74, 376). The ALJ also failed to address the treatment Jones receives or has received for relief of pain or other symptoms. Further, the ALJ did not address factors that purport to precipitate and aggravate Jones' symptoms, as well as the type, dosage, effectiveness, and side effects of any medication that Jones takes or has taken to alleviate pain or other symptoms. For example, the ALJ found that the "medical record from Stroger Hospital showed that the claimant had a history of partial compliance with diabetic medication and the claimant testified at the hearing to letting his medication run out." (R. at 24). However, the ALJ failed to ask Jones at either hearing whether Jones was then compliant with his medication, ignored claimant's testimony that the ibuprofen caused him to be tired, and ignored Dr. Nwumeh's statements that Jones was compliant with his medication. (R. at 319, 383-84).

Additionally, this Court finds that the ALJ erred in rejecting without justification medical evidence supportive of Jones' complaints of fatigue and dizziness. The reasons for an ALJ's credibility finding must be "grounded in the evidence and articulated in the determination or decision." SSR 96-7p. Moreover, a credibility determination "must contain

specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* To this end, the ALJ cannot make an independent medical determination. *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994).

Here, ALJ Harmon rejected claimant's fatigue and dizziness based on the ALJ's independent determination that these were a result of Jones' partial compliance with his medications. The ALJ states that Jones' episodes of dizziness, fatigue, and hypoglycemia "would surely" be caused by Jones' allowing "his medication to run out." (R. at 24-25). However, the record does not demonstrate that this is "surely" the case. The medical evidence does not indicate that every time Jones' symptoms of fatigue and dizziness arose, he was non-compliant with his medications. Although the ALJ noted that Jones testified to letting his medication run out, the ALJ did not ask Jones about his current compliance at either hearing. (*Id.*). Further, Jones testified regarding other possible causes of those symptoms, including that one of the side effects of taking his medication, specifically the ibuprofen, made him "sleepy." (R. at 383). Although Dr. Nwumeh did note some correlation in non-compliance with medications and these symptoms in his treating notes, no doctor specifically opined that Jones' non-compliance was "surely" the cause of his symptoms of fatigue and dizziness. (R. at 212). On May 4, 2007, when specifically asked whether Jones was compliant with his prescribed treatment and diabetic medications, Dr. Nwumeh indicated that Jones was compliant. (R. at 319). For these reasons, the ALJ's credibility determination cannot stand. *See Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003). On remand, the ALJ must clearly explain his credibility finding and set forth specific

reasons for that finding. Among other things, the ALJ must point to substantive medical evidence in the record to explain his conclusion and his rejection of any contrary evidence, and must address the issue of whether Jones had good reasons for his non-compliance.

## V.   THE ALJ'S RFC DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS NOT FREE FROM LEGAL ERROR

Jones argues the ALJ's RFC determination was insufficient because the ALJ did not analyze Jones' testimony regarding his limitations or determine how those limitations affected the RFC determination and Jones' ability to sustain full-time work. As noted above, ALJ Harmon concluded that Jones has the physical RFC to perform and sustain light work activity, including "'light exertional lifting and carrying." (R. at 25). The ALJ also found that Jones was further limited to a sit/stand option, wherein he can walk/stand for four hours in an 8-hour work day; sit six hours in an 8-hour work day with a sit/stand option; occasionally climb ramps, stairs, stoop, squat, and crouch; could not kneel or crawl; and could perform unskilled activities. (*Id.*). The ALJ stated his RFC assessment was based on "the evidence of record," giving "the claimant every benefit of the doubt regarding any reasonable allegations of discomfort and his obesity." (R. at 24-25).

Jones argues that ALJ Harmon erred by failing to consider his allegations of fatigue, frequent urination, excessive thirst, and dizzy spells when determining his RFC. An ALJ is not required to address every piece of testimony and evidence. *Carroll v. Barnhart*, 291 F.Supp.2d 783, 798 (N.D. Ill. 2003) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). However, an ALJ may not select and discuss only that evidence which favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow us to trace the path of his reasoning. *Diaz*, 55 F.3d at 307. The ALJ

"must build an accurate and logical bridge from the evidence" to his conclusion. *Dixon*, 270 F.3d at 1176.

Here, ALJ Harmon specifically stated that he based his RFC determination on "the evidence of record." (R. at 24). However, it appears that the ALJ relied solely on the medical source statements and his credibility assessment in determining Jones' physical RFC. (R. at 24-25). An ALJ's RFC assessment must be based on *all* of the relevant evidence in the record, including, among other things, claimant's medical history, medical signs and findings, effects of treatment, and reports of daily activities, in addition to medical source statements. SSR 96-8p. Here, however, among other things, ALJ Harmon did not discuss Jones' blindness or prosthetic right eye. (R. at 24-25). While the ALJ mentioned that Dr. Biale found no clear retinopathy and the Ophthalmology Screening Clinic at Stroger Hospital found no evidence of diabetic retinopathy, the ALJ did not discuss Jones' medical history of right eye prosthesis or Dr. Andrews' diagnosis of decreased vision and far acuity which may cause discrimination in "details of small objects at a distance." (R. at 24, 151, 159, 179). ALJ Harmon also did not discuss Jones' history of a gun shot wound to the back, fractured fifth metatarsal shaft of his left foot, or Jones' reports of limitations to his daily activities. (R. at 247, 273-310, 372-73, 379-80).

Moreover, the ALJ's opinion does not assure this Court that he considered all the important evidence or allow us to trace the path of his reasoning. Under the applicable regulations, the RFC assessment must always consider and address medical source opinions, and if the assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. SSR 96-8p. Here, ALJ Harmon rejected Dr. Andrews' and Dr. Nwumeh's RFC assessments. (R. at 25). While the ALJ did adopt

28

the majority of the ME's assessment, the ALJ found Jones to be even further limited. (*Id.*).

Thus, while ALJ Harmon's final RFC assessment conflicts with a portion of each medical source opinion to some extent, the ALJ failed to explain why the ME's assessment was not adopted in full, or how the ALJ came to his final conclusion regarding Jones' further limitations, and thus we cannot trace the path of his reasoning. Consequently, remand is appropriate.

## VI. THE ALJ'S INCORRECT CHARACTERIZATION OF JONES' VISION AS "BINOCULAR"

At oral arguments, claimant's counsel raised for the first time the additional issue that the ALJ's hypothetical to the VE specifying claimant's vision capabilities incorrectly referred to claimant as "binocular." (3/4/09 Tr. at 21). Because Jones did not raise the issue in his opening motion, the Court need not decide whether the issue is grounds for remand. Nevertheless, and because we have already found that remand is necessary, we will address the ALJ's characterization of Jones' vision as "binocular." (R. at 415.)

When an ALJ poses a hypothetical question to a VE, the question must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record. *See Meredith v. Bowen,* 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question be supported by the medical evidence in the record."). Here, in the ALJ's second hypothetical to the VE, the ALJ characterized the claimant's vision as "binocular" in the left eye, but accurately stated that the claimant is blind in his right eye and could see out of his left eye. (R. at 415). The VE found that this would not further limit any of the jobs the hypothetical individual could perform in the national economy. (*Id.*). In the third hypothetical, the ALJ again stated that the claimant's

vision was "binocular," but failed to correct this characterization. (*Id.*).

The ALJ's statements that Jones is "binocular" are not supported by the medical evidence, which instead establishes that claimant is blind in his right eye. (R. at 168). This Court cannot determine if the VE was confused by the ALJ's "binocular" characterizations of Jones' vision, and whether that confusion impacted his opinions regarding the number of available jobs that could be performed by the hypothetical individual. On remand, when posing hypotheticals to the VE involving vision, the ALJ must avoid characterizing claimant's vision capabilities as both "binocular" and blind in the one eye.

## VII.  CONCLUSION

For the reasons above, Jones' motion for summary judgment [23] is granted in part and denied in part, and the Commissioner's motion for summary judgment [27] is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

ENTERED:

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: July 22, 2009**